**GUARANTY TRUST CO. OF NEW YORK v. SALT'S TEXTILE MFG. CO. et al.**

**COMMERCIAL FACTORS CORPORATION et al. v. SMITH.**

**No. 92.**

Circuit Court of Appeals, Second Circuit.

March 9, 1936.

James N. Rosenberg and Chandler Bennitt, both of New York City (Norman A. Adler, of New York City, of counsel), for appellants.

Pullman & Comley, of Bridgeport, Conn. (Arthur M. Comley, of Bridgeport, Conn., of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a decree passing the accounts of William T. Smith, as receiver of the defendant, over the objections of two creditors, the Commercial Factors Corporation and the Veeanday Corporation. The defendant was a very large manufacturer of "pile fabrics", and had been in business since 1890; it had been losing money for several years before 1926 and on April twenty-second of that year with the consent of all its creditors, though against the advice of the judge, Smith was appointed its receiver under the familiar sequestration bill in equity. He has continued in office down to the present time, and on

November 15, 1929, he filed an account covering his transactions till then, and asking that they be passed, that he be allowed $40,000 in addition to what he had already received, that an allowance be given to his attorneys, and for other incidental relief. The appellants who are creditors of the defendant, filed exceptions to this account on October 6, 1930, and much evidence was taken before the judge, who on February 7, 1924, overruled the exceptions and passed it; it is not clear whether he also granted the allowances asked for, but we shall assume that he did. Several incidental points were raised which for the moment we reserve; the main objection was that the receiver should be charged with any losses due to continuing the business after January 1, 1927; or if not that, then for keeping on after several dates later in that year; and if he was not held for anything earlier, at least for continuing after January 1, 1928. A subsidiary position is that, regardless of when he should have liquidated, he should be charged with neglect during the actual liquidation which began late in 1927, and was completed by the summer of 1929. The grounds for seeking so to surcharge the receiver for failure to liquidate earlier are first, that he had been operating at a loss and for this reason should have discontinued on his own initiative; and second, that he deceived the creditors as to the profits he had made and so prevented their closing down the business themselves.

In 1921 the defendant issued three and a half million dollars of bonds, secured by a mortgage on its several plants and the next year Smith became one of its directors. Smidt and Scheidler of the firm of Victor & Achelis, which may be taken to represent the protesting creditors then and now, and which was the defendant's factor, were already directors and remained so thereafter. In 1923 they and Smith and two others became the executive committee and had the immediate directing control of the company. In that year the Philadelphia plant was shut down, and in 1924 Smith went abroad to sell another plant in Lyons, France, which he did, and after which he was made chairman of the board of directors, which post he held until 1925. In 1924 after the sale of the French plant the factor's advances had been reduced to $150,000 which were well secured; but thereafter, the business still continuing unsuccessful, the defendant had run up a factor's debt of $2,400,000, for which the value of the goods pledged was only

about $1,400,000. In addition there were some $600,000 of general debts which the factor bought up, thus becoming the sole unsecured creditor. The hope was that Smith, if appointed receiver, might put the company back upon a paying basis, and that a reorganization would follow. By July sixth the accountants had prepared a balance sheet upon which all subsequent accounts were based.

Smith had installed a new kind of accounting in the company's business some time before the receivership; it was somewhat complicated in detail, but the theory that lay back of it was to make provisional cost estimates based upon past experience and future prospects, and to correct these by proper entries after the event. It was therefore true, as he swore at the trial, that the monthly reports did not, and were not intended to, state the actual profits of the business, until they had been corrected. The factor may not have understood this, but the facts were all laid before it and Smith tried personally to make the system clear to Smidt though without success. He was not obliged on that account either to abandon it, or to accommodate his statements to Smidt's incapacity as a bookkeeper; he might assume that if the system was too much for his understanding, he would get the necessary help from his staff. The factor had many bookkeepers and did an enormous business; it may have been natural that as a head of that business Smidt should not charge himself with the bookkeeping, but the means were all at his disposal to find out the situation, and he was no tyro in the business. No inventory was taken as of April 22, 1926; instead, the goods manufactured and in process of manufacture were written down by some $331,000 which was entered as an operating loss for the first four months of the year. Part of this "write-down" appeared as a reserve for the "quick liquidation" of "current goods," which was set up as a liability of $121,000 in the balance sheet with which the receivership started. All this was clear on the statement sent to the factor; on it Smith might properly assume his monthly statements would be read, and if they had been so read, they could not have deceived anyone. Consistently with this set-up he took monthly as a profit so much of the reserve as proved unnecessary and showed it as a profit, labelled "other income." It was found very shortly that the "write-down" of $331,000 had been too great by about $65,000, which

was therefore added as of April thirtieth, as an adjustment of the price of "finished goods," "work in process" and "processed materials." This was carried in the monthly statements until September when it was cancelled, and a contrary item of $60,000 was deducted. At the same time an item of $13,000 as a quantity correction was added. How the last figure was reached did not appear at all on the account and it is not very clear even yet, but it is too small to have determined the factor's conduct and it is unnecessary to pursue it further.

On October 15, 1926, the factor had advanced over $3,300,000 and being insufficiently secured was unwilling to go further. On the other hand it was necessary that it should take its place alongside any new money secured, for as things were its lien was paramount. To secure the relinquishment of the pledge Smith wrote to it and to the bondholders a letter setting out his views of the future of the business. In it he said that his operations had borne out "in the fullest manner" his analysis of the "possibilities," and that the profits up to August thirty-first were over $228,000. This figure was reached after including the "write-up" of $65,000 of April thirtieth which had appeared upon the statement of August thirty-first; and as we have said this had in fact been cancelled and a "write-down" of $60,000 had taken its place as of October first. But Smith was not chargeable for this omission for two reasons; first, he did not know of the adjustment, making a nett difference of $126,000 because it was not made until November ninth; second, the change, being figured as a reduction of inventory so far as it affected profits at all, would increase them; and the accumulated profits as of October first were in fact much larger than at the end of August. It is true that in his profits he had included the extinguishment of about $100,000 of the reserve of $121,000 above-mentioned. This was separately set down, however, in all the monthly statements, according to a statement accompanying the original balance sheet of April twenty-second: "This reserve, however, measures reduction required in case of quick disposal of such goods and the gradual extinguishment of the reserve as the goods to which it attaches are sold will be taken into profit and loss statement, not as trading profit, (which would reflect in receiver's accounts as an abnormal profit from operations), but as 'Other Income,' which will permit of more equitable and intelligent

comparison of Receiver's operations with those of former periods." If the factor read the statements with this in mind all was plain, and the worst that can be said was that the letter of October fifteenth ought to have included a warning that Smith was speaking from his books.

At the end of the year he showed a profit for eight months of operation of $244,000, computed in accordance with his system. We do not understand that the factor asserts that there is anything wrong in this beyond what we have already mentioned, except for a quantity adjustment of $35,000, which did not figure in the profit and loss account but was carried over into the balance sheet as a capital depreciation ("adjustment to deficit"). The excuse for this treatment of the item was that this quantity shortage might have occurred before the receivership, in which event it should show as a capital adjustment. Smith had to choose where to put it, and there seems to be no reason why he should have called it an operating loss. The proper way was to show it for what it was and this he did on "Exhibit C," attached to his report; its disposition was not concealed to anyone who took the trouble to examine the account. Nor are we impressed with the argument that his statement of the income during the receivership conflicts with the income tax return filed for the whole year, which showed a loss of $679,000. This sum included $225,000 of unamortized bond interest which did not figure in the operating statement. It also included $313,000 of loss incurred before April twenty-second, and of course it included the "write-down" of $331,000 made in the place of a new inventory. The sum of these is $869,000 and turns the loss shown in the income tax return into a profit of $190,000. Although $54,000 remains to be accounted for, the adjustment of $35,000 for quantity taken in December accounts, and charged to the period before the receivership, together with a loss on the sale of real estate before April twenty-second, $15,000, make up all but a little, and that is to be found in a series of cross items which it is not necessary to consider in detail.

Thus, so far as we can see, the accounts were kept consistently and showed everything plainly, except for the doubt as to when the quantity shortage should be credited and for the item of $13,000 in the "write-up" of October first, which last we disregard for the reasons we have given.

It does not of course follow that Smith should have spoken of the business as going on at a profit; that depended upon the propriety of the adjustments of $331,000 in April and $35,000 in December. But it would certainly have been fair for him to start with a new inventory, taken as of April twenty-second; he ought not to have charged himself with original values which no longer existed when he began operations. The "write-down" was only a rough substitute for such an inventory and everybody knew it; at least the factor was fully advised of it. It seems to us also that the operating account properly included the transactions in the "A" goods, though these were finished on April twenty-second. When a business starts of course there can be no such item, but this was not a start; on the contrary Smith was carrying on an old business just as it had been carried over from one year to another. If creditors or shareholders had wished to know whether the operation for a past year had been profitable, they would have included transactions in finished goods carried over, and if an inventory had been taken, such goods would have figured at their new inventory value. Smith's silence about the reserve was perhaps not quite so defensible, for as we understand it, the effect of this was to state the profits on a liquidation basis, which was hardly what the factor would have expected. But even if we should assume that the letter pro tanto was misleading and that the profits should have been stated at $128,000 instead of $228,000, there is not the least reason to say that this would have resulted in the factor's closing down the business; or indeed that it would have done so, even though the business had been operated at a loss. It had been so carried on for a considerable time, and a receivership is notoriously disastrous for any business. Smidt and Scheidler did indeed say that they relied on what Smith told them and that we accept; but they do not say, and probably could not truthfully say, that they would have closed it down, had there been a loss for eight months. Indeed there is every reason to say that they would not, for they did not do so in 1927 though the statements showed losses for nearly every month. Smith did hold out to them hopes of improvement, and they are now disposed to believe that he cajoled them into going along with him, but there is not the least reason to question his good faith, which is all that they could demand. While they intimate that he might have wanted to keep on the business for some reason of his own, the suggestion is not borne out by anything we can find. His allowances were substantial but he was turning them over to Harriman & Co.; what could have improperly influenced him we are at a loss to see.

The decision to go on for the year 1927 was made effective in December by a decree entered with the consent of the bondholders and the factor. It authorized the issue of receiver's certificates payable May first which Smith could extend and which the factor was to accept in place of its lien. These were issued in January and bought by some Bridgeport banks, with whose money the business was continued. As we have just said, the losses were pretty steady throughout the year as the monthly statements showed. The only questionable item in these is one made up in part of charges of interest against the factor for the proceeds of sales of the goods pledged. It had itself allowed this charge during 1926, and the matter was debated by Smith and his lawyers during the spring of 1927. No such charge was made for 1927 before the May statement which was after the letter of May second to which we now come. In spite of the losses for the first four months of the year Smith still hoped for a reorganization of the business and prepared a plan which he sent out in the letter we have just mentioned. The details are not important but the factor insists that again it was beguiled into temporizing further, when, had it known the truth, or had Smith not wheedled it, it would have closed down the business. Whilst the letter did indeed urge the creditors to go on, Smith still really believed that it could be made successful, and in spite of any persuasion the creditors had the responsibility of judging for themselves; they knew that his hopes were only hopes and they could forecast the future as well as he. At least that was true of the factor whose officers had actually served on the company's executive committee. The only possible ground for challenging the truth of what he said is the following passage: "The earnings of the Receivership experienced during eleven months and forecasted for the month of April, adjusted to give effect to the form of reorganization proposed herein, would indicate profits before December interest requirements of $416,281. for the year." The meaning of this is not clear. The earnings for 1926 even if we

750

should not deduct the "Darby" losses of $69,000 (the bondholders were to take over that plant), were only about $310,000 and, as we have said, there was a nett loss for the first four months of 1927. What corrections Smith had in mind we cannot know, but it seems to us greatly overstrained to say that the creditors might take the statement as one of past fact. They had the accounts all before them and they knew what had been earned for the twelve months; Smith might assume, indeed he ought to have assumed, that they would take the figure as prospective and hypothetical as it was apparently intended.

The attempt at reorganization failed, and the business went along. The certificates were extended for a year by decree in July, all the creditors again consenting, and the losses continued. In the autumn it became apparent, however, that except for the automobile upholstery department, the time had come to stop, and all other production was stopped by the end of the year and liquidation began pro tanto. Smith still had faith that he could create or find a demand for upholstery, and in the autumn with the concurrence of the creditors, he had put $150,000 into new machinery for making it. There was again no deceit, though he did persuade them that it was worth the chance, and proved to be wrong. The ratio of 150 for the value of the free assets as compared with the debts, established by the decree of December, 1926, meanwhile began to be in peril; it was maintained until the following spring only by treating taxes as unsecured debts. The upholstery department lingered for six months until in June, 1928, even Smith gave it up.

■ We can find nothing in all this with which to impose the excessively harsh remedy invoked. It may well be that when a receiver finds that he is running the business at a loss, he takes his chances if he does not put the matter before the court. Wire Wheel Corporation v. Fayette B. & T. Co., 30 F.(2d) 318, 320 (C.C.A. 7). But we hold that Smith kept the creditors informed of how he was doing; and with that knowledge they consented to the extension of the certificates and to the resulting continuation of the business. He was not their mentor, and while he did indeed owe them the highest duty of good faith and disclosure, after all, the business was theirs to do with as they chose, and the decision was theirs as well. The situation was toto coelo different from that of a group of creditors, small, scattered and unfamiliar with the business, who in some sense may be treated as a receiver's charges; the measure of his duties is the degree of their need and helplessness. If Smith was too sanguine or too ardent, he did not become liable for that; not even though he infected the creditors with his confidence. Finally it must throughout be remembered that all this was in the years 1926 and 1927, when men prided themselves on their faith in that new and bright economic order which was to know no end. Like the District Judge we can see nothing more in the situation than an effort to harness upon the receiver the crushing burden of a venture which miscarried and in which all shared on an equal footing.

■■ The charge that Smith neglected his duties during liquidation rests upon the flimsiest foundation. He does say that he gave very little of his time to it, only a sixth or seventh after 1927. That indeed seems little, but it does not follow that it was not enough. Ordinarily liquidation is a more routine matter than operation; and whilst it requires honest and capable supervision, it demands little invention or direction. But even if we were to agree that he had not given as much time as he should, it would be impossible to assess what was the resulting damage. He assigned his allowances as receiver to Harriman & Co. with whom he was employed, and who, he thought reasonably enough, might reduce his pay if he took so much time from his duties with them. The theory is that such an assignment is invalid under our decision in Fischer v. Liberty Nat. B. & T. Co., 61 F.(2d) 757. But it does not appear that the assignment was made before the allowances had been earned and, if it was not, it was lawful enough. In re Brown, 4 F.(2d) 806 (C.C.A.2). On the other hand we cannot see the justification for so large an allowance as the judge made. Smith had already received $52,000 before the account was filed and has been allowed $40,000 more. He had had a salary of $25,000 a year while he was employed by the company, and that seems to us enough for the active period. An allowance of $2,500 with what he has already received will give him that salary from April 22, 1926, to January 1, 1928, and

$500 a month thereafter up to November 15, 1929. Considering the disastrous results, this seems to us all that the case will stand.

 The judge refused to consider any surcharges or falsifications of the account after its date, and he was right. Smith was not discharged and will have to account for the remaining period; such questions must be reserved until he does.

Allowance reduced to $2,500; decree otherwise affirmed. The appellants bear the costs.